**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| IN RE:<br><br>DORCHESTER RESOURCES, LP,<br><br>                                         Debtor. | Case No. 21-10840-SAH<br>(Chapter 11) |

**COVER SHEET FOR DECLARATION OF JOHN T. PERRI,
MANAGER OF DC-LRCOGP, LLC, THE GENERAL PARTNER OF
DORCHESTER RESOURCES, L.P., IN SUPPORT OF CHAPTER 11
<u>PETITION AND FIRST DAY MOTIONS</u>**

Respectfully Submitted,

/s/ J. Clay Christensen
J. Clay Christensen (OBA # 11789)
Jeffrey E. Tate (OBA #17150)
Jonathan M. Miles (OBA #31152)
Brock Z. Pittman (OBA #32853)
Emily J. Irwin (OBA #33880)
CHRISTENSEN LAW GROUP, P.L.L.C.
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma  73116
Telephone: (405) 232-2020
Facsimile: (405) 228-1113
Clay@christensenlawgroup.com
Jeffrey@christensenlawgroup.com
Jon@christensenlawgroup.com
Brock@christensenlawgroup.com
Emily@christensenlawgroup.com

PROPOSED ATTORNEYS FOR DEBTOR

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE:<br><br>DORCHESTER RESOURCES, L.P.,<br>___Debtor. | Case No. 21-10840-SAH<br>(Chapter 11) |

**DECLARATION OF JOHN T. PERRI,
MANAGER OF DC-LRCOGP, LLC, THE GENERAL
PARTNER OF DORCHESTER RESOURCES, LP, IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, John T. Perri, hereby declare under penalty of perjury:

1. I am the Manager of DC-LRCOGP, LLC, the General Partner of Dorchester Resources, LP ("DR"), an Oklahoma Limited Partnership, and the above captioned Debtor.

2. I have been Manager of DC-LRCOGP, LLC since approximately July 2015.

3. As Manager, my responsibilities include, among others, overseeing the operations of DR, evaluating DR's restructuring and refinancing alternatives, and analyzing and valuing its operations and assets.

4. Altogether, I have over 15 years of experience in the oil and gas industry.

5. In my position as Manager, I have developed a thorough knowledge of the corporate organization, financial policies, books and records, general business affairs, and daily operations of DR.

6. Except as otherwise indicated below, all facts set forth in this Declaration are based upon my personal knowledge of DR's operations and finances.

7. The information provided in this Declaration was learned from my review of relevant documents, information supplied to me by the agents employed to help manage

DR and their advisors, or is my opinion based on my own extensive experience, knowledge, and information concerning DR's operations and financial condition.

8.  I am over the age of 18 and am authorized to submit this Declaration on behalf of DR, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

**A.   DR's Filing of Bankruptcy and First Day Motions.**

9.  On April 5, 2021 (the "Petition Date"), DR filed its voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the Western District of Oklahoma (the "Bankruptcy Court").

10.  Contemporaneously herewith, DR has filed, or will file, one or more common "first day motions" seeking orders granting various forms of relief intended to stabilize DR's business operations, facilitate the efficient administration of this chapter 11 case, and allow DR to fulfill its duties as a debtor in possession, which DR anticipates to include:

(a.)   Debtor's Emergency Motion for Entry of an Order (I) Creating a Master Service List and (II) Granting Authority to Limit Notice by Approving Alternative Website Notice Procedures, with Brief in Support, Notice of Opportunity For Hearing, and Notice of Hearing ("Motion to Limit Notice");

(b.)   Debtor's Emergency Motion for Interim and Final Orders (A) Authorizing the use of Cash Collateral, (B) Providing Notice to File Objections; (C) Scheduling a Final Hearing; and (D) Granting Related Relief, together with Brief, Notice of Opportunity for Hearing, and Notice of Hearing ("Cash Collateral Motion");

    (c.)    Debtor's Expedited Motion for Order Under 11 U.S.C. §§ 105, 363, 364, 1107 and 1108 (I) Authorizing Continued use of Existing Bank Accounts, Business Forms, and Cash Management System; (II) Waiving Requirements of Section 345 of the Bankruptcy Code; with Brief, Notice of Opportunity for Hearing, and Notice of Hearing ("Cash Management Motion"); and

    (d.)    Debtor's Motion for Interim and Final Orders (I) Authorizing But Not Directing Debtor to Pay or Honor Royalty Payments, (II) Authorizing, but not Directing, Debtor to Pay Authorization for Expenditure (AFE) Amounts Consented to, (III) Authorizing, but not Directing, Debtor to Pay Critical Joint Interest Billings, (IV) Authorizing Financial Institutions to Honor Related Payment Requests and (V) Granting Related Relief ("Motion to Pay Mineral Interests and AFE Obligations").

(collectively the "First Day Motions").

11. I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable DR to operate in chapter 11, and to minimize the disruption that early phases of chapter 11 can cause.

12. I believe the relief sought in the First Day Motions is in the best interests of the bankruptcy estate, of DR's creditors, and of interested parties.

13. I submit this Declaration to provide an overview of DR, as well as for support of the pleadings mentioned above.

**B.    DR's Business Background and Operations.**

14. DR is a privately-owned oil and gas company headquartered in Oklahoma City, Oklahoma, to engage in all phases of the oil and gas business including:

- exploration for and production of oil, gas and other hydrocarbons;
- buying, selling, owning, managing, operating, financing, producing and developing ownership interests;

- marketing and transporting oil, gas and other hydrocarbons; and
- investing in or being connected with entities engaged in the oil and gas business.

15. DR has no employees. Present ownership of DR came into ownership of it in about 2011. Its assets and operations are currently managed by Dorchester Energy Management, LLC, a well-qualified team of industry professionals.

16. DR's primary assets are comprised of (a) an aggregate 2½% non-operating interest in each of approximately 55,000 mineral leases (the "Leases"), (b) an aggregate 2½% interest or less in approximately 6,200 producing wellbores (the "Wellbores"), all of which are primarily located in Oklahoma, Texas, Louisiana, and Virginia, and (c) revenues from the Leases and Wellbores (collectively the "Assets").

17. DR is not an operator. The Leases and Wellbores in which DR holds working interests are operated by approximately 500 operators of record.

18. DR owns no commercial real estate, but it does have one commercial lease with Jamestown Office Park LLC for office space, which expires in July of 2021.

19. For a majority of the Leases and Wellbores in which DR holds an interest, DR is simply a non-operator working interest owner. The respective operators are charged with disbursing payments to the various royalty owners and other working interest owners.

20. On the other Leases and Wellbores, DR takes payment for its non-operating interest in kind. For these, DR markets the hydrocarbons it takes and is responsible for making royalty payments accordingly.

C. **DR's Pre-Petition Secured Debt Structure.**

21. DR is a party to a secured financing transaction agreement with Simmons Bank, an Arkansas state chartered bank, successor by merger to Bank SNB ("Simmons"), which provides for revolving loans and letters of credit of up to a total of $40,000,000.00, subject to a borrowing base determination (the "Simmons Credit Agreement").

22. Currently, the Simmons Credit Agreement has been amended and restated eight times over the years.

23. The Simmons Credit Agreement, including all notes, security agreements, assignments, pledges, mortgages, and other instruments, agreements, and documents executed in connection therewith or related thereto are referred to herein collectively as the ("Simmons Pre-Petition Claim Documents").

24. Pursuant to the Simmons Pre-Petition Claim Documents and applicable law, Simmons holds a valid, enforceable, and allowable claim against all Assets of DR, as of the Petition Date, in an aggregate amount of at least $20,000,000.00 which is comprised of unpaid principal, plus any and all accrued and unpaid interest, fees, costs, expenses, charges, and other claims that may be allowed to Simmons under 11 U.S.C. § 506(b).

D. **DR's Pre-Petition Unsecured Liabilities**

25. DR's pre-petition general unsecured debts are primarily disputed claims of various operators. DR is still finalizing its bankruptcy schedules and statements, but estimates that the amount of pre-petition general unsecured claims is between $7,000,000.00 and $12,000,000.00. Again, this estimated amount claimed is disputed.

E. **DR's Pre-Petition Priority Unsecured Liabilities.**

26. DR files its income tax returns as a limited partnership under the Internal Revenue Code.

27. The partners are taxed individually on their shares of partnership taxable income or loss.

28. DR's pre-petition priority unsecured debts are primarily sales and related tax claims to the revenue authorities of Oklahoma, Texas, Louisiana, and Virginia arising from the sale of hydrocarbons when DR is the actual seller.

29. DR does not believe his has any priority unsecured pre-petition debts

F. **The Necessity for DR's Chapter 11 Bankruptcy.**

30. DR's bankruptcy is necessary for several confluent reasons. To begin, the entire oil and gas industry began suffering from a general economic downturn in 2014, which has persisted to the present.

31. In addition to long term pricing declines, energy prices have remained depressed during the past 12 months in part as a result of the COVID-19 pandemic and the related quarantines, travel restrictions, and reduced manufacturing outputs.

32. Additionally, production in certain areas in which DR holds interests may be economical for the operator, but is uneconomical for DR and other non-operating interest owners in light of the current pricing environment and low production volumes.

33. Further, certain operators have compounded the negative effects of marginal wells located in one area of production by "netting" revenues the operators owe to DR on

other, economically profitable interests located in different areas. DR believes this netting is in violation of Joint Operating Agreements and other agreements.

34. DR has attempted to stem the financial drain caused by the non-economical wells through negotiations with the relevant operators. While DR was able to reach a successful resolution with its largest operator, it has not been able to reach similar resolutions with others.

35. Ultimately, due to various factors including those cited above, DR's management has determined in the exercise of its business judgment that DR, as an ongoing business, is no longer economically viable in its current position.

36. In order to maximize the value of the Assets, DR has procured a Stalking Horse Purchaser to buy a certain defined portion of Assets for a base purchase price of $10,000,000.00 (the "Designated Assets").

37. The sale of the Designated Assets will be subject to a marketing period and potential auction, should it be necessary.

38. Because of the financial constraints faced by DR, it is proposing a quick, but commercially reasonable, timetable for the sale of the Designated Assets.

**G.   First Day Motions.**

39. I have consulted with advisors and understand each of the First Day Motions and the relief requested therein.

40. I believe that the relief requested in the First Day Motions is necessary, in the best interests of DR's estate, its creditors, and all other parties in interest, and will allow

DR to operate with minimal disruption and maximum value preservation during the pendency of this chapter 11 case.

41. Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to DR, its business, and its estate. Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.

***Cash Collateral Motion***

42. As stated above, Simmons holds a valid, secured lien in all of DR's Assets, including accounts and proceeds (the "Cash Collateral").

43. All of DR's cash on hand and revenues to be received are encumbered by Simmons. Consequently, there is no unencumbered cash sufficient to support DR's ordinary course business operations.

44. DR and Simmons have not presently reached an agreement regarding the terms of consensual use of the Cash Collateral in return for the adequate protection offered in the Cash Collateral Motion, and the proposed Interim Order related thereto.

45. I believe DR urgently needs the ability to use of Cash Collateral to generate revenue, operate its businesses, pay expenses, and pursue the contemplated sale of the Designated Assets. This is compounded as Simmons offset all amounts in Debtor's bank accounts either late Friday, April 2, 2021, or early Saturday, April 3, 2021; it is my understanding that Simmons knew DR was filing bankruptcy on Monday, April 5, 2021.

46. I also believe that an inability to access the Cash Collateral would result in immediate and irreparable harm to DR, and diminish the value of the bankruptcy estate.

47. DR, with the assistance of its counsel, developed a budget for the use of Cash Collateral during the period for which the budget was prepared. The budget contains line items for the general categories of cash flow anticipated to be received or disbursed during the budget period.

***Motion to Pay Mineral Interests, AFE Obligations, and Critical JIBs***

48. Although DR is not an operator, there are certain wells from which it is paid in kind for its non-operating working interest.

49. In these instances, DR markets and sells its share of production.

50. Upon receiving sales proceeds, DR is obligated to remit to holders of royalty and other affected ownership interests their share of these proceeds (the "Payment Obligations").

51. Oil and gas leases, Joint Operating Agreements, and state statutes together create a framework that require strict payment deadlines.

52. Failure to timely remit the Payment Obligations could expose DR to financial penalties and create causes of action for breach of contract, conversion, or other damage claims. This could result in the assertion of significant secured or unsecured claims against the property of the estate.

53. DR's monthly Payment Obligations are not static. The amounts paid out each month is dependent upon a variety of factors, including the terms of the various agreements described above; changes in ownership percentages; the volume of production; the type of production; and current commodity prices among other factors.

54. An estimated monthly aggregate average of DR's Payment Obligations is approximately $80,000.00 to $100,000.00.

55. The Payment Obligations are generally remitted approximately 60 days following the end of a production month.

56. DR estimates that, as of the Petition Date, there is approximate outstanding amount of approximately $80,000.00 to $100,000.00 in Payment Obligations owed.

57. Based on the circumstances, DR needs this Court's authority (a) to pay outstanding Payment Obligations and (b) to continue honoring such prepetition Payment Obligations in the ordinary course of business, subject to DR's right to dispute asserted amounts and to withhold payment pending resolution of any such dispute.

58. Additionally, DR holds non-operating working interests in several new wells that are in various stages of completion. DR has consented to various into Authorization for Expenditures ("AFE"), which obligate DR to pay its proportionate share of certain agreed-to completion expenses.

59. If DR does not remit its portion of AFE charges, it risks losing its related working interests. Consequently, DR requests permission to pay these charges in the ordinary course of business to preserve its interest in these wells, the pre-petition amount of which DR estimates to be approximately $50,000.00 to $60,000.00. DR estimates that it will incur up to approximately $800,000.00 in post-petition AFE Charges as well. However, as the work is performed by the operator, it is not entirely possible to know if all these amounts will need to be paid in the first 13 weeks. In addition, the Stalking Horse Bidder has agreed to assume such obligations should it be the winning bidder.

60. Additionally, as the operator of a well, Debtor is charged with tasks including (a) the daily operations and maintenance of a well, (b) payment of royalties, and (c) invoicing and collecting the joint interest billings, which are the pro rata share of well expenses owed by the non-operating working interest owners (the "JIBs").

61. Commonly, the operator pays all or most of the expenses associated with a well, and then later submits JIB invoices to the non-operating working interest owners for payment of their pro rata share of the invoiced expenses.

62. Contracts entered into between an operator and non-operating working interest owner typically grant operators a contractual lien on the non-operating party's interests in the oil and gas property to secure the payment of obligations owed to the operator, such as JIBS.

63. DR's failure to timely pay JIBs will likely result in operators asserting liens under applicable state and federal law against DR's interests in the Leases and the Wellbores.

64. DR's monthly JIBs typically average approximately $280,000.00 as presently handled. However, the netting of DR's revenues by the various operators complicates this issue.

65. If asserted, these liens could restrict DR's ability to dispose, transfer, or otherwise assign its property; this in turn could potentially severely impair DR's business, operations, and contemplated asset sale. Consequently, DR requests that it be permitted to pay only those JIBs as it deems necessary to preserve the maximum value in the contemplated sale (the "Critical JIBs") in the ordinary course of business.

***Motion to Limit Notice***

66.     DR requests authority to limit notice of specified matters only to designated entities that are entitled to notice, and any other entities that the Court may direct.

67.     DR has approximately 8,000 creditors and parties in interest on its matrix.

68.     Providing notice of all matters in this case to thousands of individuals and/or entities would substantially delay the providing of notices in this case, place an enormous financial and administrative burden on DR's estate, and could impede the consummation of transactions, negotiations, settlements, and/or the granting of relief that may be advantageous to DR's estate.

69.     I believe that DR's suggested notice procedures will minimize administrative burdens and expenses in this case without diminishing creditor participation.

70.     As set forth in the Motion to Limit Notice, Omni Agent Services, LLC ("Omni") has established a website and call center that will "go live" as soon as possible after this case has been filed. Omni's website will give all creditors and interested parties access to all pleadings, free of charge, and will post all relevant deadlines and significant events. Additionally, the call center will be able to assist persons with general questions and direct calls to appropriate channels as needed.

***Cash Management Motion***

71.     In the ordinary course of its business, DR maintains only two bank accounts (collectively, the "Accounts"). One is a commercial checking account held at Simmons, in which all revenues are deposited, either from direct deposit, ACH payments, or by traditional checks (the "Operating Account"). All operating expenses, Payment

Obligations, and other payments are made from this account as well. The second account is used to hold funds "in suspense" for Payment Obligations for which DR is missing a valid address or other information necessary to accurately issue payment to its intended recipient. Payment Obligations that become stagnant for certain periods of time will escheat to the state in which the respective royalty owner resides (the "Escheat Account"). Escheat payments are governed by state statues.

72. As of April 5, 2021, there was $0.00 in the Operating Account, and $0.00 in the Escheat Account. As of late afternoon on Friday, April 2, 2021, DR had a total of $2,064,628.18 in the Accounts, $1,839,641.20 in the Operating Account and $224,628.18 in the Escheat Account. Between about 3:00 p.m. on Friday and 10:00 a.m. on Saturday, April 3, 2021, Simmons Bank set off the full amount of both accounts.

73. As a result, DR will need to seek post-petition financing and will seek permission from the Court to do so.

74. DR believes that implementing the Office of the United States Trustee's operating guidelines relating to debtor-in-possession bank accounts would disrupt the flow of deposits of revenues, and ability to make required timely Payment Obligations.

75. Because of the nature of this case, changing checks, correspondence, and business forms would be unduly expensive and burdensome to DR and its estate.

76. DR believes the controls, accounts, forms and practices that are in place adequately protect the bankruptcy estate, creditors, and parties in interest. Further, DR will work closely with the United States Trustee to ensure that it is satisfied that DR's finances are fully transparent, properly managed, and adequately safe.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: April 5, 2021

_____
John T. Perri, Manager
DC-LRCOGP, LLC
General Partner of Dorchester Resources, LP